Clayton W. GOTTSCHALK, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7572.

Court of Appeals of Alaska.

Nov. 23, 2001.

---

**32.** 953 P.2d 888, 896 (Alaska 1998).

**33.** *See* Op. at 41.

**34.** *See* 32 U.S.C. § 324(b).

**35.** *Bowen*, 953 P.2d at 894, 894–95.

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Douglas H. Kossler, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

This appeal presents two issues, one involving Alaska's speedy trial rule (Criminal Rule 45) and the other involving the propriety of a peremptory challenge exercised by the prosecutor.

Clayton W. Gottschalk was charged with felony driving while intoxicated, felony breath test refusal, driving with a suspended license, and leaving the scene of an accident.[1] His trial was scheduled for October 27, 1998, with trial call scheduled for the day before (October 26th).

The first issue on appeal arose because Gottschalk failed to appear at the trial call.

---

1. AS 28.35.030(n) (driving while intoxicated); AS 28.35.032(p) (breath test refusal); AS 28.15.291(a) (driving with a suspended license); AS 28.35.050(b) (leaving the scene of an accident).

With Gottschalk's whereabouts unknown, the superior court issued a warrant for his arrest. Gottschalk was located and arrested four and a half months later, on March 11, 1999. He was re-arraigned the following day, March 12th.

The question is this: Because of Gottschalk's flight and lengthy absence, should his speedy trial calculation under Alaska Criminal Rule 45 have been reset to Day 1 when he was again apprehended? For the reasons explained here, we conclude that it should.

The second issue on appeal arose during jury selection at Gottschalk's trial. Gottschalk is an Alaska Native. Early on, Gottschalk announced that he believed the courts of Alaska had no jurisdiction over him because the United States government had never signed a treaty with his tribe. As the jury was being picked, most prospective jurors were asked their opinion regarding Native sovereignty.

The prosecutor's first peremptory challenge was exercised against a Native American woman (a member of a tribe from the Lower 48). Gottschalk's attorney asked the superior court to invalidate this peremptory challenge, claiming that the prosecutor exercised the challenge solely because of the juror's race—conduct declared to be unconstitutional in *Batson v. Kentucky*.[2] The prosecutor responded that he was concerned by the juror's answers regarding Native sovereignty. The trial judge concluded that this was a well-founded explanation of the prosecutor's peremptory challenge, so he denied Gottschalk's *Batson* motion to set aside the challenge.

■ On appeal, Gottschalk argues that the juror's answers gave no indication that the juror supported the Native sovereignty movement, and thus the record fails to support the prosecutor's offered explanation for the peremptory challenge. We agree. However, under *Batson*, the question is not whether the record supports the prosecutor's reasons for distrusting the juror's ability to

be fair. Rather, the question is whether the prosecutor honestly believed, based on something other than the juror's race, that the juror would not be a good juror. The superior court found that the prosecutor acted in good faith, and not from racial bias or stereotyping. Because this finding is not clearly erroneous, we affirm the superior court's denial of Gottschalk's *Batson* motion.

### *The Rule 45 issue*

Gottschalk was initially served with the charging documents on May 25, 1998. This event started the running of the Rule 45 "clock".[3] But, as explained above, Gottschalk failed to appear at his trial call on October 26, 1998. He was arrested on a bench warrant and re-arraigned on March 12, 1999.

This court addressed a similar situation in *Russell v. Anchorage*, 626 P.2d 586 (Alaska App.1981). The defendant in *Russell* failed to appear for trial and was not arrested until several months later.[4] This court held that the Rule 45 clock should be reset, making the day of Russell's re-arrest a new Day 1, because of the following three factors:

(1) the defendant intentionally fail[ed] to appear for court; (2) his disappearance [was] followed by a substantial period of absence; and (3) by virtue of [the] defendant's inaction[,] no progress [was] made in the normal pretrial process before the defendant's disappearance.

*Id.* at 590.

Gottschalk concedes that his case looks like *Russell* insofar as factors (1) and (2) are concerned, but he contends that, with regard to factor (3), the facts of his case are distinguishable from *Russell*. Gottschalk argues that substantial pre-trial progress had been made in his case by the time he absconded. Gottschalk points out that:

[a]t his arraignment, he requested and was appointed a public defender.... [In the next several weeks], he had four pre-indictment hearings [as] the parties [attempted] to negotiate the case. After [these negotiations failed and] Mr. Gott-

**2.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**3.** *See* Criminal Rule 45(c)(1).

**4.** *See id.* at 587–88.

schalk was indicted, ...' he attempted to file a Bill of Particulars which he had written himself. Thus, unlike the defendant in *Russell,* Mr. Gottschalk obtained counsel and took action in his case prior to his failure to appear.

■ But Gottschalk's argument hinges on a fairly restrictive reading of *Russell*'s third factor. This narrow construction of the third factor is inconsistent with the way we applied the *Russell* rule in *Conway v. State,* 707 P.2d 930 (Alaska App.1985). In *Conway,* the defendant

> was arrested [and charged] on February 8, 1980...'. [Through counsel, he] negotiated ... with the state for a resolution of [his] case without trial. When negotiations broke down, trial was scheduled for the week of November 17, 1980.... Conway did not appear, and ... his whereabouts were unknown until he was rearrested approximately two months later....

*Id.* at 935. We held that, under these facts, "[a]ll three [*Russell* ] factors are present".[5] Indeed, we stated that the facts of *Conway* presented "an even more compelling case than *Russell* for the recommencement of the 120 day period" because Conway, unlike Russell, was represented by counsel.[6]

Based on our decision in *Conway,* we conclude that the *Russell* rule applies to Gottschalk's case: Gottschalk's act of absconding and his ensuing lengthy absence caused the Rule 45 clock to be reset. The event that restarted the clock was Gottschalk's re-arraignment on March 12, 1999. Thus, the following day—March 13, 1999—became Day 1 for purposes of Rule 45.[7]

Gottschalk was brought to trial 144 days later, on August 3, 1999. However, the proceedings were delayed for two months (from April 2, 1999 through June 3, 1999) when Gottschalk's attorney asked the court to investigate Gottschalk's mental competency to stand trial. Deducting these 62 days from the total elapsed time of 144 days, it is clear that Gottschalk was brought to trial within the 120 days specified by Rule 45.

*The Batson attack on the prosecutor's peremptory challenge*

■ Before Gottschalk's trial began, he asked the superior court to grant him co-counsel status. Gottschalk wanted co-counsel status so that he could present an argument that his attorney did not wish to raise: the contention that, because Gottschalk was of Yupik descent and because no representative of the Yupik people had signed the Treaty of Cession of 1867 (*i.e.,* the treaty in which Russia transferred ownership of Alaska to the United States), the courts of Alaska had no jurisdiction over him.

Gottschalk's announcement affected the course of jury selection. Because it appeared that Gottschalk would try to inject the issue of Native sovereignty into the trial, both the prosecutor and the defense attorney questioned several prospective jurors concerning their views on Native sovereignty. One of these prospective jurors was Marcia Bannon, who identified herself as a Native American, a member of the Eastern Allegheny Nation.

When the prosecutor asked Ms. Bannon to explain her understanding of Native sovereignty, she replied:

> Well, the Constitution of the United States says ... that Native Americans will be treated by treaty as independent nations. So, as to each of those nations, they had to sign a treaty. But Alaska Natives are different, and they—so that's done differently. So if you're talking about sovereignty with the—with Native Americans, that's different than sovereignty for Alaska Natives.

The prosecutor then asked Bannon to state her views with respect to the sovereignty of Alaska Native tribes. She answered,

> I think it's a very complex question, and it needs to be resolved legislatively, and with the people involved. I'm not an Alaska Native.

---

5. *Id.*

6. *Id.*

7. *See Nickels v. State,* 545 P.2d 163, 165 (Alaska 1976) (when an event triggers Rule 45, the following day is deemed Day 1).

When the defense attorney's turn came, she too asked Bannon about Native sovereignty. This time, Bannon stated,

> I don't think it's good for the State of Alaska, but I don't want to get into their [*i.e.*, Alaska Native] issues.

When the time came for the prosecutor to exercise his first peremptory challenge, he challenged Bannon. The defense attorney objected that the prosecutor's action violated the rule established in *Batson v. Kentucky*.[8] That is, the defense attorney argued that the prosecutor had exercised his peremptory challenge for racial reasons (*i.e.*, because Bannon was a Native American).

The prosecutor did not wait for the trial judge, *pro tem* Superior Court Judge Gregory J. Motyka, to decide whether the defense attorney had established a *prima facie* case of racial motivation (normally, the first step in a *Batson* analysis).[9] Instead, the prosecutor offered an explanation of the peremptory challenge. The prosecutor told Judge Motyka that he had decided to challenge Bannon because (1) he perceived Bannon as hostile and (2) he was worried about Bannon's views on Native sovereignty.

Judge Motyka stated that he did not personally perceive hostility in Bannon's answers to the prosecutor's questions, but he also declared that her demeanor "[possibly] could have been interpreted as . . . hostile to the State." Moreover, Judge Motyka agreed that the prosecutor might legitimately be concerned about Bannon's responses on the Native sovereignty issue. The judge therefore overruled the defense attorney's *Batson* objection and allowed the peremptory challenge to stand. On appeal, Gottschalk renews his argument that the prosecutor violated *Batson* by exercising a peremptory challenge against Bannon purely because of Bannon's race.

Gottschalk points out that Judge Motyka did not personally perceive Bannon to be hostile. For this reason, Gottschalk asserts that Judge Motyka engaged in "after-the-fact invention" when the judge declared that the prosecutor might possibly have viewed Bannon as hostile. But there is no logical inconsistency in Judge Motyka's saying that he personally did not perceive Bannon as hostile, yet at the same time acknowledging that other reasonable people (in particular, the prosecutor) might have assessed Bannon's demeanor differently.

With respect to the prosecutor's second explanation of the peremptory challenge—the prosecutor's concerns over Bannon's statements about Native sovereignty—Gottschalk argues that the record does not support the prosecutor's offered explanation. That is, Gottschalk contends that Bannon's answers did not provide a reasonable basis for anyone to conclude that Bannon could not be a fair juror, even though the trial might raise issues of Native sovereignty.

■ We agree with Gottschalk that Bannon's answers would not lead a reasonable person to question her ability to be fair, or to question her willingness to follow the judge's instructions on Native sovereignty or related matters. But that is not the issue under *Batson*. An attorney's reason for exercising a peremptory challenge need not constitute a reason that would justify a challenge for cause. Indeed, requiring affirmative proof of the prospective juror's inability to be fair would defeat the whole concept of a peremptory challenge. *Batson* requires only that the attorney honestly base their peremptory challenge on a race-neutral reason—"something other than the race of the juror".[10]

■ If the attorney offers a race-neutral explanation for the challenge, and if the attorney is acting in good faith—if the attorney's stated reason for exercising the challenge is not simply a subterfuge for racial discrimination—then the peremptory challenge will survive a *Batson* objection even if

---

**8.** 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**9.** *See Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

**10.** *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1856, 1866, 114 L.Ed.2d 395 (1991).

the attorney's reason for the challenge is "not . . . persuasive or even plausible".[11]

For example, in *Purkett v. Elem*[12], the defendant was tried for robbery in a Missouri court. During jury selection the prosecutor used peremptory challenges to strike two African–American potential jurors. When the defense attorney raised a *Batson* objection, the prosecutor explained the reasons for the strikes as follows:

> I struck [juror] number twenty-two because of his long hair. He had long curly hair. He had the longest hair of anybody on the panel by far. He appeared to me to not be a good juror for that fact, the fact that he had long hair hanging down shoulder length, curly, unkempt hair. Also, he had a mustache and a goatee type beard. And juror number twenty-four also has a mustache and goatee type beard. Those are the only two people on the jury . . . with facial hair. . . . And I don't like the way they looked, with the way the hair is cut, both of them. And the mustaches and the beards look suspicious to me.

*Elem*, 514 U.S. at 766, 115 S.Ct. at 1770.

The trial judge overruled the *Batson* objection and, after the defendant was convicted and appealed, that ruling was affirmed by the Missouri Court of Appeals. The defendant then filed a petition for federal habeas corpus. The federal district court concluded that the Missouri courts' determination that there had been no purposeful discrimination was a factual finding—*i.e.*, a finding entitled to a presumption of correctness under 28 U.S.C. § 2254(d). Since there was support for that finding in the record, the district court denied the petition for writ of habeas corpus.

However, the Eighth Circuit reversed the district court's decision and directed the district court to grant the writ of habeas corpus. The appeals court held that it was not sufficient for an attorney to articulate race-neutral factors behind a peremptory challenge;

rather, "the [attorney] must [also] at least articulate some plausible race-neutral reason for believing those factors will somehow affect the person's ability to perform his or her duties as a juror." [13] From its review of the transcript, the Eighth Circuit concluded that the "prosecution's explanation for striking juror 22 . . . was pretextual" and that the trial judge had erred in not finding intentional discrimination.[14]

The United States Supreme Court granted the State of Missouri's petition for writ of certiorari and reversed the Eighth Circuit. Here is how the Supreme Court described the Eighth Circuit's mistake:

> The Court of Appeals erred by combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, *i.e.*, a "plausible" basis for believing that "the person's ability to perform his or her duties as a juror" will be affected. It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.
>
> The Court of Appeals appears to have seized on our admonition in *Batson* that to rebut a prima facie case, the proponent of a strike "must give a 'clear and reasonably specific' explanation of his 'legitimate rea-

---

**11.** *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (*per curiam*).

**12.** 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*).

**13.** *Elem v. Purkett*, 25 F.3d 679, 683 (8th Cir. 1994).

**14.** *Id.* at 684.

sons' for exercising the challenges," and that the reason must be "related to the particular case to be tried." This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.

*Elem*, 514 U.S. at 768–69, 115 S.Ct. at 1771 (citations omitted) (emphasis in the original).

■ In other words, after an attorney articulates a race-neutral reason for the peremptory challenge, the next—and ultimate—issue is the attorney's good faith. The trial judge must decide whether the articulated reason is the attorney's *true* reason for the peremptory challenge or whether it is a sham, an invention to mask the attorney's discriminatory intent. The party who raised the *Batson* objection bears the burden of persuasion on this issue.[15]

■ Moreover, in practically all cases, the trial judge has the ultimate word on the issue of the attorney's intent. As the United States Supreme Court explained in *Hernandez v. New York*,

[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal[.] . . . Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding "largely will turn on evaluation of [the attorney's] credibility." In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence will often be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind is based on demeanor and credibility "peculiarly within the trial judge's province." 500 U.S. at 364–65, 111 S.Ct. at 1868–69 (citations omitted).

In Gottschalk's case, the prosecutor offered a race-neutral reason for challenging juror Bannon: her views on Native sovereignty. The fact that the prosecutor's rationale might have a disproportionate impact on the Native members of the jury pool does not mean that the explanation constitutes unlawful discrimination. As the Supreme Court stated in *Hernandez*, "Equal protection analysis turns on the *intended* consequences of government classifications. Unless the [prosecutor] adopted a criterion *with the intent of causing the [disparate] impact* . . ., that impact itself does not violate the principle of race neutrality." [16]

Because the prosecutor offered a race-neutral explanation for the peremptory challenge of juror Bannon, the remaining question is whether Gottschalk proved that the prosecutor's explanation was a subterfuge to mask a discriminatory intent. Judge Motyka found that Gottschalk had not met this burden; the judge concluded that the prosecutor had offered an honest explanation for the peremptory challenge.

The transcript of juror Bannon's voir dire may not show that the prosecutor's apprehensions were well-founded—but, as explained above, that is not the issue. Judge Motyka found that the prosecutor honestly exercised the peremptory challenge for the reasons the prosecutor articulated: apprehension over Bannon's apparent hostility and apprehension over Bannon's statements concerning Native sovereignty. Judge Motyka's decision regarding the prosecutor's credibility and good faith necessarily rested, not only on the judge's assessment of the content of Bannon's answers, but also on the judge's assessment of such imponderable factors as the prosecutor's tone of voice and demeanor. Because of this, we can not say that Judge Motyka's conclusion is clearly erroneous. We therefore uphold Judge Motyka's denial of Gottschalk's *Batson* challenge.

---

**15.** *See Elem*, 514 U.S. at 767, 115 S.Ct. at 1771.

**16.** *Id.*, 500 U.S. at 362, 111 S.Ct. at 1867 (emphasis added).

*Conclusion*

The judgement of the superior court is
AFFIRMED.