Vannaphone **SOUNDARA**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–8329.

Court of Appeals of Alaska.

Feb. 11, 2005.

12. 22 P.3d at 484.

13. *Id.* at 491.

Paul E. Malin, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Vannaphone Soundara assaulted his common-law wife over the course of six or seven hours. Based on this conduct, Soundara was convicted of mitigated kidnapping (*i.e.*, a kidnapping in which the defendant voluntarily releases the victim without sexually assaulting or inflicting serious physical injury on the victim) and two counts third-degree assault.[1]

Soundara appeals his convictions, contending that the trial judge improperly rejected his efforts to remove a juror after the juror disclosed, in the middle of trial, that his mother had been the victim of domestic violence. In a separate argument, Soundara also contends that the evidence presented at his trial supports only one conviction for third-degree assault, not two.

In addition, Soundara appeals his kidnapping sentence. He argues that the sentencing judge applied the wrong presumptive term when calculating his sentence, and he further argues that the evidence does not support the judge's finding of aggravating factor AS 12.55.155(c)(2)—that Soundara acted with deliberate cruelty.

For the reasons explained here, we remand Soundara's case to the superior court for reconsideration of the juror issue. We can not say that the trial judge abused his discretion when, following full disclosure of the facts, the judge concluded that the juror could be fair. Nevertheless, Alaska law is clear that if the juror knowingly withheld relevant information during voir dire, Soundara would be entitled to removal of the juror regardless of whether the juror could be fair. The trial judge never made a finding as to whether the juror knowingly withheld relevant information during voir dire; accordingly, we must remand Soundara's case to the superior court.

In addition, we conclude that Soundara's two convictions for third-degree assault must merge into one consolidated conviction. It is true, as the State argues, that the evidence presented at Soundara's trial is sufficient to support the conclusion that Soundara assaulted the victim twice, with the two assaults separated by a significant interval. But the jury was never asked to decide this issue—and this question of fact is for the jury, not for the trial judge or for an appellate court.

Finally, we conclude that Soundara's sentencing judge employed the correct presumptive term, and that the evidence supports the sentencing judge's finding of deliberate cruelty.

### The facts of the kidnapping and assault

On May 4, 2000, Soundara's common-law wife, T.K., told Soundara that she was leaving him and moving to California. During the next two days, Soundara and T.K. argued repeatedly about T.K.'s decision. Then, on the night of May 6th, Soundara bound T.K.'s hands and feet with speaker wire. For the next six or seven hours, Soundara beat T.K. intermittently while the couple's two small children cried in a nearby bedroom.

According to the State's evidence, Soundara whipped T.K. with speaker wire, hitting her more than 30 times and leaving cuts and bruises over half of her body. During the course of the hours-long assault, Soundara strangled T.K. (again, with the speaker wire), he struck her with a knife handle and with the dull edge of the knife blade, and he struck her with the butt of a gun. At one point, Soundara pointed the gun between T.K.'s eyes and threatened to shoot her. He also threatened to slice T.K.'s thigh with the knife and to rub salt into the wound. And Soundara told T.K. that if she left him after this, he would shoot their children, set fire to them, and then kill himself. Finally, around five o'clock in the morning on May 7th, Soundara released T.K.

Based on these events, Soundara was charged with kidnapping and several counts of first-, second-, and third-degree assault.

### The challenge to Juror Stahn

As jury selection was beginning, the trial judge, Superior Court Judge Larry D. Card, required all of the prospective jurors to swear to tell the truth during the jury selec-

---

1. AS 11.41.300(a) & (d), and AS 11.41.220(a), respectively.

tion process. Judge Card then read the indictment against Soundara. This indictment informed the prospective jurors that Soundara was charged with restraining T.K. with the intent to inflict injury on her, and that he was additionally charged with causing injury to T.K. by means of wire or cord, and with threatening T.K. with both a gun and a knife. Before the attorneys commenced their voir dire questioning, Judge Card asked the members of the jury pool if there was any reason why they felt they could not be fair in a case like Soundara's. Prospective juror Keith Stahn did not respond to Judge Card's question.

The prosecutor then told the prospective jurors that Soundara's case concerned "domestic violence", that it was a case involving "[an] assault on a woman" by means of a knife and speaker wire. The prosecutor asked the prospective jurors whether "anyone would have a problem sitting here and listening to the facts of this case". Stahn did not respond.

The prosecutor told the jurors that, if Soundara's case was to be decided impartially, it was important that the jurors not have "anything in [their] background . . . to interfere with [their] listening to the facts of this case and coming to a [fair] conclusion at the end of the trial". The prosecutor then asked the prospective jurors, "Has anyone been charged with, [or been] the victim of, or [been] a witness in [an] assault or [an act of] domestic violence?" Several potential jurors responded to the prosecutor's question, but Stahn did not.

While Stahn was present in court, several prospective jurors revealed that family members, or other people whom they were close to, had been victims of domestic violence. All of these prospective jurors were released from jury service. In addition, several other jurors responded to questions concerning the difficulty of remaining impartial in cases like Soundara's, if a friend or family member of theirs had been subjected to domestic violence.

When it was Stahn's turn for individual voir dire, the prosecutor asked him, "So you're comfortable with everything that you've heard, and [you have] no questions about . . . the issues that have been raised?" Stahn replied, "No problems." The prosecutor then asked Stahn if there was "any reason" why Stahn could not sit as a juror in Soundara's case. Stahn responded, "No, I don't think that there's any reason"—but then he added that he probably should talk about "one thing . . . that came up yesterday". Stahn thereupon revealed that he was a member of the Ruffed Grouse Society, an organization that supports the preservation of woodlands for grouse and other game birds.

When it was Soundara's attorney's turn to question Stahn, the defense attorney asked if Stahn had "ever had [an] experience with . . . a family member or . . . friend where domestic violence [was] an issue". Stahn replied, "No."

Based upon Stahn's answers to these voir dire questions, Soundara's attorney passed Stahn for cause.

But later in the selection process, after two other prospective jurors had been questioned about their experience with domestic violence, Stahn asked Judge Card for a "sidebar" (*i.e.*, a private conference with the judge and the attorneys). When the sidebar conference was convened, Stahn told the judge:

> *Stahn:* It just occurred to me that maybe I should let you know that I'm separated from my wife, and [that] we live in separate households. I have possession of my son; she has possession of my daughter. I don't think that that would affect my decision . . . or [my] judgement [in this case].
>
> *The Court:* Well, divorce happens in a lot of families. But is there domestic violence being alleged . . . by either party?
>
> *Stahn:* No.
>
> *The Court:* So, do you feel that [this] would affect your ability to be fair [in this case]?
>
> . . .
>
> *Stahn:* [No,] I can be fair.

Neither attorney had any questions based on this exchange, so Stahn resumed his place among the prospective jurors.

Neither side exercised a peremptory challenge against Stahn, so he ultimately became a member of the jury. During jury selection, Soundara's attorney exercised eight of his eleven allotted peremptory challenges.[2] That is, the defense attorney had three peremptory challenges remaining when the attorney decided to leave Stahn on the jury.

On the first day of trial (December 5, 2001), Judge Card asked all of the selected jurors to stand and take a second oath—their oath as jurors to decide Soundara's case fairly and honestly. Judge Card told the jurors that the criminal justice system "depends on . . . the honesty and integrity of . . . individual jurors". The judge also told the jurors, "[By taking this second oath,] you affirm that your answers to the questions that were [earlier] put to you concerning your qualifications to sit on this jury were complete and correct . . . and that there [is] nothing that I or the parties should know about you that we did not know from asking [those] questions as to your ability to sit as a juror."

The judge then asked the jurors, "Now, . . . do any of you believe that there is something that we should know that we do not know now?" Stahn remained silent.

Soundara's trial commenced. Both parties gave their opening statements, and then the State presented its first witness. At the conclusion of this first witness's testimony, Judge Card announced that he had other business that required him to call a recess. Stahn then spoke up, "Your Honor, . . . is it possible to get a sidebar?"

At this second sidebar conference, Juror Stahn revealed that his mother had been the victim of domestic violence:

> Stahn: Your Honor, it occurred to me when [the attorneys] were doing their opening remarks that—although I was a small child, I was only nine months [or] a year or two old, whatever—my mother was involved in domestic violence, I guess you could call it, with my [biological] father. . . . I've heard stories from her [and] one that sticks out in my mind is about . . . some conflict between the two [of them],

and throwing a knife or something behind the stove, and—although I don't [personally] remember any of that.

> The Court: All right; I see. It's just what you were told [by your mother]?

> Stahn: Yes, sir.

> The Court: All right. Does that affect your ability to still be a fair juror in this case?

> Stahn: No, sir.

> The Court: All right. You just wanted to bring [this] to the attention of the parties?

> Stahn: Yes, please.

Judge Card then asked the attorneys if, because of Stahn's revelation, they wished to ask any further questions. Neither attorney wished to ask any other questions of Stahn. However, Soundara's attorney declared that she would have exercised a peremptory challenge against Stahn if she had known of this.

Judge Card refused to allow the defense attorney to exercise a peremptory challenge at that stage of the proceedings (i.e., with the jury already sworn and the trial already begun). The judge told the defense attorney:

> The Court: It sounds . . . to me that we've had to dig up some old, old, old injury to [Stahn's] family. . . . I've observed Mr. Stahn. He's actually brought out everything he can think of that would keep him from being involved in this case. He told us that this happened when he was very young. He has no recollection of any abuse himself, but it is [the] stories he has been told. And it seems . . . to me, when a person is told a story—and [I acknowledge that] a mother is very important [, but] on the other hand, he doesn't sound like he's formed any opinions nor is he going to be unfair to either party. And had he been challenged for cause, I would not have accepted such a challenge.

> And it seems . . . to me now, after all the questions that were asked, [that] to accept [a peremptory] challenge [at this point] would defeat the [selection] process [that]

**2.** *See* Alaska Criminal Rule 24(d) (both the State and the defendant have ten peremptory challenges in felony cases), and Criminal Rule 24(b)(1)(B) (giving each side one additional peremptory challenge when, as here, one or two alternative jurors are impaneled).

we've already gone through. We can't pick other jurors. You know, we're in flu season. I don't know if we're going to be able to keep all fourteen [jurors that we currently have]. We have a high number of flu cases in the community. [This trial will] hopefully not [be] long ..., but [we will] recess over the weekend. . . .

If I give [the defense] a peremptory [challenge], I'd have to give the State one, and we'd have to start jury selection again—and I've already sworn this jury, jeopardy has attached, and so we'd be in mistrial mode, and ... I haven't heard you asking for a mistrial. . . .

Right now, we have fourteen jurors, and so I don't want to let [Mr. Stahn] go at this time. But I'll reconsider the issue at the close of the evidence if you wish to ... raise it again. I don't have any problem with [your] raising it again before we finish [this] case. So the application [to exercise a peremptory challenge] will be denied.

Upon hearing Judge Card's ruling, Soundara's attorney immediately asked for a mistrial:

> *Defense Attorney:* Your Honor, I'm asking at this point for a mistrial. . . . I have to agree with the Court that, given the information we have from [Mr. Stahn], I don't have a strong argument for a challenge for cause. But this was information that he should have given to us. And if I had known [about] it, I would have used [a] peremptory [challenge]. [And] I think [that] if the Court is going to [stick with] its decision, [then we] should use [Mr. Stahn] as [an] alternate—that when we get to [the] point [in the trial] where we're choosing alternates, ... he should be one of them.

Judge Card did not address the defense attorney's request to designate Stahn as an alternate juror. However, the judge reiterated that he found no basis for excusing Stahn for cause, and he again denied the defense attorney's request to exercise a late peremptory challenge. In addition, Judge

Card denied the defense attorney's motion for a mistrial.

This issue arose one final time, at the end of Soundara's trial. Judge Card was getting ready to trim the jury to twelve by placing the names of all fourteen jurors in a box and then randomly selecting two of the jurors to be alternates. At this point, the defense attorney reminded Judge Card that he had promised to revisit the issue of Juror Stahn:

> *Defense Attorney:* Your Honor, Juror [Stahn] told us, after he was chosen as a juror, that he forgot to talk to us about the fact that his mother had been beaten by his father ... when he was very young. And I informed the Court that, if I had known this, I would have used a peremptory challenge [against] him. And the Court denied [my] request to bump him off [the jury], but [the Court stated] that we would have another conversation about it [at the close of the trial]. And I'm asking that [Stahn] be used as one of the alternates. . . .

> *The Court:* My recollection is that he told us that [the domestic violence] happened when he was, like, six months old, and he had no [personal] recollection [of it], and it was stories told ... to him by his mother, . . . . And he said [that] it would not affect his ability to be a fair and impartial juror. So your objection is overruled.

*Soundara's argument that, because of Juror Stahn's late disclosure of a family history of domestic violence, Soundara should have been allowed to exercise a late peremptory challenge against Stahn*

■ Under Alaska law, a party wishing to exercise a peremptory challenge against a prospective juror must do so before the jury panel is sworn.[3] Soundara acknowledges this rule, but he argues that the rule should be relaxed when a prospective juror fails to disclose information pertinent to the questions posed during voir dire, if that information would have provided a reasonable ground for the party to exercise a peremptory challenge against the juror.

---

**3.** *Grimes v. Haslett,* 641 P.2d 813, 816 (Alaska 1982); *Pearce v. State,* 951 P.2d 445, 447 (Alaska App.1998).

We do not doubt that Soundara's attorney might reasonably have wished to peremptorily challenge Juror Stahn after Stahn revealed that his mother had been the victim of domestic violence. It appears that Stahn might not have witnessed this violence himself, or might have witnessed it at such a young age that he had no personal recollection of it. Nevertheless, Soundara's attorney could reasonably surmise that Stahn had an emotional attachment to his mother and that, based on that emotional attachment, Stahn's knowledge of reports that his mother had been subjected to domestic violence would affect Stahn's assessment of criminal cases like Soundara's—i.e., criminal cases involving allegations of domestic violence.

■ Nevertheless, we must be mindful of the policies that underlie our rule that peremptory challenges must be exercised before the jury is sworn. In a jury trial, jeopardy attaches when the jury is sworn.[4] Thus, any ensuing changes to the composition of the jury may require a mistrial, or (at the least) will enhance the possibility that a mistrial will be required later, even if replacement jurors are currently available.

■ Moreover, if we allowed parties to resurrect their unused peremptory challenges in the middle of trial, we would hand attorneys a potent weapon for forcing a mistrial in cases that were going badly for them. A peremptory challenge need not be based on a valid, objective reason to distrust the juror's ability to be fair. Instead, an attorney can exercise a peremptory challenge for any non-discriminatory reason.[5] Thus, almost any new information concerning a juror might provide an attorney with grounds for arguing—with complete honesty—that the attorney would have peremptorily challenged the juror if they had known about this new information.

For these reasons, our law requires attorneys to assiduously employ the voir dire process to elicit any and all facts that the attorney might care about when evaluating the suitability of the prospective jurors. An attorney must ask sufficient questions, and sufficiently precise questions, to elicit all desired information from prospective jurors. If the attorney fails to do this, the attorney will not be heard to complain later that newly revealed information, had it been disclosed earlier, would have prompted the attorney to exercise one or more additional peremptory challenges.

We therefore reject Soundara's argument that he should have been given the opportunity to exercise a late peremptory challenge against Stahn after Stahn revealed that his mother had been the victim of domestic violence.

*The issue of whether Juror Stahn should have been dismissed from the jury for cause*

The rule that a party must exercise their peremptory challenges before the jury is sworn is premised on the assumption that the prospective jurors have honored their oath to fully and truthfully answer the questions put to them during the jury selection process. It is not equitable to bind the parties to the results of the jury selection process unless the parties are assured that prospective jurors are honestly cooperating in that process—that prospective jurors are not consciously thwarting the parties' jury selection efforts.

■ For this reason, if a juror lies or consciously withholds information during voir dire (knowing that the questions being asked on voir dire call for this information), and if the true facts would have supported a challenge for cause, our law considers this an obstruction of justice and a ground for requiring a new trial.[6]

4. *See March v. State,* 859 P.2d 714, 717 (Alaska App.1993).

5. *See Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (*per curiam*); *Gottschalk v. State,* 36 P.3d 49, 53–54 (Alaska App.2001).

6. *See State v. Titus,* 933 P.2d 1165, 1174–75 (Alaska App.1997), *reversed on other grounds* in *Titus v. State,* 963 P.2d 258 (Alaska 1998). *See also United States v. Henley,* 238 F.3d 1111, 1121–22 (9th Cir.2001); *United States v. Colombo,* 869 F.2d 149, 151–52 (2nd Cir.1989); *Hard v. Burlington Northern Railroad,* 812 F.2d 482, 485 (9th Cir.1987); *Rios v. Danuser Machine Co., Inc.,* 110 N.M. 87, 792 P.2d 419, 423 (N.M.App. 1990); *State v. Martinez,* 90 N.M. 595, 566 P.2d 843, 845 (N.M.App.1977).

For instance, in *Swain v. State,* 817 P.2d 927 (Alaska App.1991), a juror concealed her friendship with a woman who had been robbed by the defendant, and also potentially concealed her second-hand knowledge of this crime, knowledge obtained in conversations with her friend.[7] Relying on the Alaska Supreme Court's decision in *Fickes v. Petrolane–Alaska Gas Service, Inc.,*[8] we held that it was an obstruction of justice for the juror to fail to reveal her friendship with the victim or the fact that she had spoken with the victim about the crime.[9] We further held that the juror's misconduct might require a new trial, depending on exactly what second-hand knowledge the juror had concealed.[10]

In *Swain,* we remanded the case to the superior court with directions to assess the need for a new trial by applying the three-part test established by the supreme court in *Fickes v. Petrolane–Alaska:* (1) Would the appellant have challenged the juror if the juror had not concealed or misrepresented the information? (2) Was the improperly withheld information directly relevant to the decision of the case, or was it instead merely collateral to the issues being litigated? and (3) Is there a reasonable possibility that the improperly withheld information affected this juror's (or any other juror's) decision? [11]

Returning to Soundara's case, the facts of the jury selection process (construed in the light most favorable to Soundara) support the conclusion that Stahn consciously withheld information concerning the history of domestic violence in his family.

As detailed above, Judge Card repeatedly told the prospective jurors that it was important for them to reveal any information that might raise doubts concerning their ability to be fair. The prosecutor echoed this theme, telling the prospective jurors that they must not have "anything in [their] background [that would] interfere with [their] ... coming to a [fair] conclusion at the end of the trial".

Both the prosecutor and the defense attorney repeatedly asked prospective jurors if they, their family members, or their close friends had experienced domestic violence. Several prospective jurors were dismissed on this basis. After sitting through all of this, Stahn repeatedly affirmed—either expressly or by his silence in the face of inquiry—that none of these questions and admonitions applied to him.

Stahn then slowly began to reveal more information. First, he volunteered that he was a member of a game-bird habitat conservation society (the Ruffed Grouse Society). Later, he asked for a sidebar in which he revealed that he had been divorced. During the ensuing discussion, Stahn was reminded that the real issue was domestic violence: he was expressly questioned as to whether his divorce involved allegations of domestic violence. Stahn said no—but by confining his answer to the divorce proceeding, Stahn failed to give the parties any indication that his mother had experienced domestic violence.

Later, Stahn was sworn as a juror. At that time, Judge Card told all of the jurors that, by taking this second oath, all of them affirmed that their answers to the questions put to them during voir dire "were complete and correct". Judge Card then asked all of the jurors, "Do any of you believe that there is something that we should know about that we do not know [now]?" Stahn (by his silence) declared that there was nothing.

Then, a little later, after the parties had given their opening statements and the first witness had testified, Stahn asked for another sidebar. Only then did Stahn reveal that his mother had been the victim of domestic violence.

Stahn's explanation for his late disclosure is ambiguous: "Your Honor, it occurred to me when [the attorneys] were doing their opening remarks...." This could be an assertion that Stahn remembered this information for the first time while he was listening to the attorneys deliver their opening state-

---

7. *Swain,* 817 P.2d at 929.

8. 628 P.2d 908, 910–11 (Alaska 1981).

9. *Swain,* 817 P.2d at 935.

10. *Id.*

11. *Swain,* 817 P.2d at 935, citing *Fickes,* 628 P.2d at 911.

ments. On the other hand, Stahn might have been asserting that he perceived the significance of this information for the first time while he listened to the attorneys' opening statements. But in either case, the record provides grounds for questioning Stahn's assertion.

If, in fact, Stahn understood the relevance of this information during the jury selection process, and if he consciously withheld this information in the face of questions and admonitions that reasonably called for this information, then Judge Card should have evaluated Soundara's motion for a mistrial using a test analogous to the one we employed in *Swain*. In particular, Judge Card should have considered whether Stahn consciously withheld the information concerning his family history of domestic violence and, if so, whether Soundara would have challenged Stahn if the improperly withheld information had been disclosed.

■ In this regard, we emphasize that if Stahn did indeed consciously withhold this information, it does not matter whether he did so with the intent to deprive Soundara (or the State) of a fair trial, or whether he did so out of reticence to reveal a sensitive facet of his family history, or for any other reason. A prospective juror's conscious misrepresentation or withholding of information during voir dire constitutes an obstruction of justice, not because of any provable unfairness in the jury's verdict, but because the juror's conduct deprives the parties of their rights during the jury selection process. As we explained in *State v. Titus*, 933 P.2d 1165 (Alaska App.1997), "[w]hile the collateral consequences of voir dire fraud might often be invalidation of the verdict, the [supreme court's opinion in] *Fickes* ... clearly focused on the defect in voir dire." [12]

Although Judge Card ruled that Stahn's late-disclosed information did not provide a basis for a challenge for cause, the record shows that the judge was considering only the question of whether this new information proved that Stahn could not be a fair juror. Judge Card never made a finding on the issue of whether Stahn consciously withheld

pertinent information during the jury selection process, and whether this information would have prompted Soundara to challenge Stahn. If so, then this would have been an independent reason to grant Soundara's motion for a mistrial.

Accordingly, we must remand Soundara's case to the superior court. Judge Card must determine whether, during the jury selection process (*i.e.*, before the jury was sworn), Stahn understood the relevance of the reports of domestic violence perpetrated on his mother, and Stahn consciously withheld this information in the face of questions and admonitions that reasonably called for this information.

If Judge Card finds these things to be true, then Judge Card must decide whether Soundara is entitled to a new trial by conducting the three-part analysis we adopted in *Swain*. That is, Judge Card must decide: (1) Would Soundara have challenged Stahn if Stahn had not concealed this information? (2) Was the improperly withheld information directly relevant to the decision of Soundara's case, or was it instead merely collateral to the issues being litigated? and (3) Is there a reasonable possibility that Stahn's knowledge of domestic violence perpetrated against his mother affected Stahn's vote as a juror?

(In this appeal, Soundara and the State argue whether, at the close of Soundara's trial, Judge Card had the discretion to designate Stahn as an alternate juror—a procedural device that might have avoided the issues of whether Soundara should have been allowed to exercise a late peremptory challenge, or whether Stahn should have been excused for cause. We view this "alternate juror" controversy as moot. As we have explained, a peremptory challenge to a juror must be exercised before the trial commences, but a juror's willful misrepresentation or withholding of pertinent information during voir dire can be an independent ground for declaring a mistrial or granting a new trial. In Soundara's case, his entitlement to relief hinges on resolution of this latter issue.)

12. *Id.* at 1175.

*Soundara's two convictions for third-degree assault must merge into one consolidated conviction*

■ Soundara was found guilty of third-degree assault under two separate clauses of AS 11.41.220(a). He was convicted under section 220(a)(1)(A) for recklessly placing T.K. in fear of imminent serious physical injury by means of a dangerous instrument, and he was convicted under section 220(a)(1)(B) for recklessly causing physical injury to T.K. by means of a dangerous instrument.

Soundara, relying on this Court's decision in *Allain v. State*,[13] argues that these two convictions were based on the same underlying conduct—an assault with speaker wire—and therefore the two convictions must merge into a single consolidated conviction. The State responds that two separate convictions are proper because the evidence at Soundara's trial showed that the two assault charges were premised on separate acts, with "a significant break in time and circumstance between each act".[14]

Even though the evidence at Soundara's trial might be interpreted in the way the State suggests, the problem remains that Soundara's jury was never asked to resolve whether the two convictions were based on one continuing assault or separate assaults. We addressed this same problem in *Simmons v. State*, 899 P.2d 931 (Alaska App. 1995).

The issue in *Simmons* was whether the defendant could properly be convicted of two separate counts of being a felon in possession of a handgun, or only one consolidated count. On appeal, the State contended that the evidence presented at Simmons's trial was sufficient to establish that Simmons had given the gun away at one point, and then had regained possession of it, so that he committed two separate acts of possession.[15] We held

that this issue had to be decided by the jury—that it could not be decided by an appellate court in the first instance:

[The fundamental problem with the State's argument is that], although the evidence presented at trial might theoretically have supported a finding of interrupted possession, the jury was never required to consider or decide the issue. Because the instructions did not apprise the jury of the need to find that Simmons' possession of the .44 magnum pistol had been interrupted at some point between the first alleged offense and the second, the jury's verdicts left the issue unresolved. At this juncture, "[a]ny ambiguity must be resolved in favor of the accused." Accordingly, we conclude that Simmons' two convictions must merge.

*Simmons*, 899 P.2d at 937 (citations omitted).

We reach the same conclusion in Soundara's case. The jury made no finding as to whether the two assault convictions were based on a single underlying act or two separate acts. Therefore, the convictions must merge.

*Soundara's sentencing for his kidnapping conviction was governed by a 7-year presumptive term rather than a 5-year presumptive term*

■ Soundara was convicted of mitigated kidnapping as defined in AS 11.41.300(d).[16] This offense is a class A felony. Soundara was a first felony offender, so his sentencing for this class A felony was governed by AS 12.55.125(c)(1) and (c)(2).

Section 125(c)(1) states that a first felony offender convicted of a class A felony is subject to a 5-year presumptive term unless the offense involves the circumstances described in section 125(c)(2). The pertinent portion of section 125(c)(2) prescribes a 7-

---

13. 810 P.2d 1019, 1021 (Alaska App.1991).

14. Quoting *Williams v. State*, 928 P.2d 600, 604 (Alaska App.1996).

15. *Simmons*, 899 P.2d at 936.

16. AS 11.41.300(d) states: "In a prosecution for kidnapping, it is an affirmative defense which

reduces the crime to a class A felony that the defendant voluntarily caused the release of the victim alive in a safe place before arrest, or within 24 hours after arrest, without having caused serious physical injury to the victim and without having engaged in conduct described in AS 11.41.410(a), 11.41.420, 11.41.434, or 11.41.436."

year presumptive term for a first felony offender convicted of a class A felony if "the defendant possessed a firearm [or] used a dangerous instrument ... during the commission of the offense".

At sentencing, Judge Card ruled that Soundara's case fit under both of these clauses: that is, he found that Soundara both possessed a firearm and used dangerous instruments (a knife and speaker wire) during his kidnapping of T.K. (Recall that the jury convicted Soundara of third-degree assault under AS 11.41.220(a)(1)(A) and (1)(B), thus necessarily finding that he used a dangerous instrument.)

Nevertheless, Judge Card and the parties engaged in a lengthy debate (over the course of two separate hearings) as to whether Soundara was subject to a 5–year or 7–year presumptive term. Soundara argued that the 5–year presumptive term should apply to his case because, if it did not, he would be subjected to a more severe penalty for mitigated kidnapping than he would have faced if he had been convicted of normal kidnapping. Judge Card rejected Soundara's position (for reasons that are not pertinent here), and Soundara renews his contention on appeal.

Here, in a nutshell, is Soundara's argument: Normal (unmitigated) kidnapping is an unclassified felony that has a penalty range of 5 to 99 years.[17] Mitigated kidnapping, on the other hand, is a class A felony (*i.e.,* a lesser degree of felony) with a penalty range of 0 to 20 years, but the offense carries various presumptive terms: for first felony offenders, either 5 years or 7 years; for second felony offenders, 10 years; and for third felony offenders, 15 years.[18] Soundara contends that it is fundamentally unfair, and logically inconsistent, for the law to impose a 7–year presumptive term on him and other first felony offenders convicted of mitigated kidnapping involving a weapon, when he would have faced only a 5–year presumptive term if he had been convicted of normal kidnapping, even if he possessed a firearm or used a dangerous instrument.

The flaw in this argument is that normal kidnapping does not carry a 5–year presumptive term. Rather, it carries a 5–year *mandatory minimum term.*

 A mandatory minimum term is the least possible sentence that can be imposed for a particular crime. A mandatory minimum represents the legislature's assessment of how much prison time should be imposed on an offender even when the offender's background is extremely favorable and the offender has engaged in the most mitigated conduct within the definition of the offense.[19] A presumptive term, on the other hand, is intended for a *typical* offender. The presumptive term "represents the legislature's judgement as to the appropriate sentence for a typical felony offender (*i.e.,* an offender with the specified number of prior felony convictions, and with a typical background) who commits a typical act within the definition of the offense."[20]

If Soundara had been convicted of normal kidnapping, he could not have received anything less than 5 years to serve, and he might have received as much as 99 years to serve. Moreover, because mandatory minimum sentences are intended for the least serious offenses within the statutory definition, Soundara would have received a more severe sentence than the 5–year mandatory minimum unless he affirmatively convinced the sentencing judge that his background was uncommonly favorable and that his conduct was uncommonly mitigated.[21]

17. *See* AS 12.55.125(b), which reads (in pertinent part): "A defendant convicted of ... kidnapping ... shall be sentenced to a definite term of imprisonment of at least five years but not more than 99 years."

18. *See* AS 12.55.125(c).

19. *See Clark v. State,* 8 P.3d 1149, 1150 (Alaska App.2000); *Middleton v. Anchorage,* 673 P.2d 283, 284 (Alaska App.1983).

20. *Clark,* 8 P.3d at 1150; *Mullin v. State,* 886 P.2d 1323, 1328 (Alaska App.1994). *See also Juneby v. State,* 641 P.2d 823, 833 (Alaska App. 1982), *modified and superseded on other grounds,* 665 P.2d 30 (Alaska App.1983).

21. *Compare State v. Brueggeman,* 24 P.3d 583, 589 (Alaska App.2001) (when a defendant is convicted of a class B felony, the defendant should not receive a sentence of less than 90 days unless both the offender and the offense are significantly mitigated).

But because Soundara was convicted of mitigated kidnapping, he faced significantly lesser penalties. Instead of a 99–year maximum sentence, he faced a 20–year maximum sentence. Instead of a 5–year mandatory minimum sentence, he faced no mandatory minimum sentence.

Rather, Soundara faced a 7–year *presumptive* term—a term of imprisonment that could be adjusted up or down. If Soundara proved any of the statutory mitigating factors listed in AS 12.55.155(d), Judge Card had the authority to reduce Soundara's sentence to 3½ years' imprisonment.[22] And if Judge Card was convinced that even this much imprisonment would be manifestly unjust, he could refer Soundara's case to the statewide three-judge sentencing panel. If the three-judge panel agreed with Judge Card's assessment, they could theoretically reduce Soundara's sentence to the statutory minimum—0 years' imprisonment.[23]

In other words, if Soundara had proved that both his background and his offense were uncommonly mitigated, the superior court could have given him a sentence far less than the applicable 7–year presumptive term. On the other hand, if Soundara had been convicted of normal kidnapping, then even if he proved that his background was extremely favorable and his offense was extremely mitigated, the superior court would have been legally bound to give Soundara at least the mandatory minimum sentence of 5 years' imprisonment. And if the superior court found that Soundara's background and offense were typical rather than uncommonly mitigated, Soundara could have received a sentence far greater than the 5–year mandatory minimum—since the sentencing range for normal kidnapping is 5 to 99 years.

(For example, second-degree murder is another unclassified felony; its sentencing range is 10 to 99 years.[24] In 1983, when the mandatory minimum sentence for this crime was only 5 years (rather than the current 10), this Court held that first felony offenders convicted of second-degree murder

should typically receive between 20 and 30 years to serve. *See Page v. State*, 657 P.2d 850, 855 (Alaska App.1983).)

For these reasons, there is no reason to doubt the legitimacy of the 7–year presumptive term specified in AS 12.55.125(c)(2) for Soundara's offense.

*Judge Card's finding that Soundara acted with deliberate cruelty*

■ As explained at the beginning of this opinion, Soundara tied T.K. up and held her captive for six or seven hours. During that time, Soundara whipped T.K. intermittently with speaker wire. In addition, Soundara beat T.K. with a knife handle and the butt of a handgun. At one point, Soundara pointed the gun between T.K.'s eyes and threatened to shoot her. He also threatened to slice T.K.'s thigh with the knife and to rub salt into the wound. Moreover, Soundara told T.K. that if she left him, he would shoot their children, set fire to them, and then kill himself.

Based on this evidence, Judge Card found aggravating factor AS 12.55.155(c)(2)—that Soundara manifested deliberate cruelty during the kidnapping. Soundara challenges this finding on appeal.

(Judge Card also found aggravator AS 12.55.155(c)(18)(C)—that Soundara committed a crime of domestic violence in the presence or hearing of children under the age of 16 living in the same residence. Soundara does not challenge this second aggravator.)

Soundara argues that his conduct in this case, "while loathsome, did not rise to the level of deliberate cruelty". But in *Jones v. State*, 765 P.2d 107 (Alaska App.1988), this Court upheld a finding of deliberate cruelty under facts similar to those of Soundara's case.

The defendant in *Jones* was convicted of felony assault. The assault charge arose from an episode where Jones terrorized his wife and stepson for a period of approximately five hours.[25] We summarized that assault in our opinion:

**22.** AS 12.55.155(a)(2).

**23.** AS 12.55.165–175.

**24.** AS 12.55.125(b).

**25.** *Jones,* 765 P.2d at 108.

Jones assaulted his wife over a period of approximately five hours. During this period, he shoved his wife's face in a bowl of spaghetti, beat her with his fists, held a knife to her throat and told her he was going to cut her up into pieces, held a knife to her ear and cut her ear, threatened and beat her eleven-year-old son, S.C., and urinated on his wife and forced S.C. to lie in the urine.

*Jones*, 765 P.2d at 109. Based on this evidence, the superior court found that Jones manifested deliberate cruelty during this assaultive episode.[26] We upheld the superior court's finding.[27]

The facts of Soundara's case are substantially similar, and we therefore reach the same conclusion: the record supports the sentencing judge's finding that Soundara's conduct manifested deliberate cruelty.

### Conclusion

The judgement against Soundara must be amended to reflect one consolidated conviction for third-degree assault (and one sentence for this offense), rather than the two convictions and two sentences reflected in the present judgement.

With regard to the issue of Juror Stahn, we remand Soundara's case to the superior court. The superior court must determine whether Stahn purposely withheld information concerning his family's history of domestic violence during the jury selection process. If so, then Juror Stahn should have been dismissed for cause—and Soundara must receive a new trial.

We affirm the other two rulings challenged in this appeal: the ruling that Soundara's sentencing was governed by a 7–year presumptive term, and the ruling that Soundara's offense was aggravated because Soundara manifested deliberate cruelty.

We retain jurisdiction of this case pending the completion of the proceedings on remand. Within 60 days, the superior court shall renew its consideration of the issue of Juror Stahn, and shall issue written findings on that issue. The superior court is authorized, in its discretion, to take additional testimony and/or allow the parties to present additional argument.

After the superior court issues its findings, the parties shall have 30 days to file memoranda addressing those findings.

When we have received the superior court's findings and any memoranda filed by the parties, we shall renew our consideration of whether Juror Stahn should have been dismissed for cause.